ELECTA HOWARD, Appellant, *v.* RUSH E. HOWARD, Respondent.

*Water rights — replacing of water logs with iron pipes — when it constitutes a repair — rights of owners of several parcels of a farm, on which the water supply existed, to share therein.*

A testator, who died in 1873, by his will devised to his wife a life estate in a farm, and, subject to such life estate, gave the south half of the farm to his son Rush, and the north half to his son Harvey.

The will further provided: "I also give my son, Harvey N. Howard, the right of bringing water through water pipes as now constructed on said farm from the Hammond brook, and the said Harvey N. and Rush are to be at equal expense in keeping the said water pipes in repair down to the branch, and thereafter each one shall be at his own expense in keeping the said pipes in repair."

At the time of the testator's death there existed upon the farm a system of log water pipes, by which water was taken to a tub at a house on the southerly half of the farm and from such tub was taken to what was known as "the branch," at which point it was divided, one part being taken to a building on

the southerly half of the farm and the other part to buildings on the northerly half of the farm. The overflow water from the tub at the barn on the southerly half of the farm was carried in an open ditch to depressed lands. A portion of this depressed land was in the northerly half of the farm.

In 1876 a railroad built across the farm entirely cut off the flow of waste water from the open ditch. In 1898, or thereabouts, the water logs were replaced with iron pipes.

In an action against Rush by a grantee from Harvey of the north half of the farm and of his claim for damages arising out of an alleged diversion of the water

*Held,* that the authority to replace the water logs with iron pipe, if necessary, was included in the provision of the will relating to repairs of the water system;

That the will did not confer on the testator's son Harvey the right to have the overflow water from the tub at the barn on his brother Rush's premises continue to run in the ditch as it existed when the testator died;

That even if any such right existed under the will, the changed condition, arising from the building of the railroad, would require some new agreement before Harvey would have the right to construct a ditch on another portion of the premises belonging to Rush;

That, under the will, the owner of each half of the farm was entitled to a reasonable use of the water upon such half.

APPEAL by the plaintiff, Electa Howard, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Essex on the 6th day of January, 1903, upon the report of a referee dismissing the plaintiff's complaint.

*A. W. Boynton,* for the appellant.

*F. A. Rowe,* for the respondent.

CHASE, J. :

In 1873 one Daniel M. Howard died the owner of a farm in the county of Essex, leaving a will by which he gave said farm and other property to his wife for life, and, subject to such life estate, he gave the south half of said farm to his son, the defendant, Rush E. Howard, and the north half of said farm to his son Harvey N. Howard, the husband of the plaintiff herein.

The division line between the north and south halves of said farm was not defined by said will, nor established until after the death of said Daniel M. Howard. By his will he also provided : " I also give my son, Harvey N. Howard, the right of bringing water through water pipes as now constructed on said farm from the Hammond

brook, and the said Harvey N. and Rush are to be at equal expense in keeping the said water pipes in repair down to the branch, and thereafter each one shall be at his own expense in keeping the said pipes in repair."

At the death of said Daniel M. Howard there was a system of log water pipes by which water was taken from the Hammond brook at a point westerly of the house on the southerly half of said farm and brought to a tub at said house, and from said tub it was taken westerly a short distance to what is termed "the branch," and the waters were there divided, one part of which was taken in logs to the barn on the southerly half of said farm, and the other part was taken in logs to the house and buildings on the northerly half of said farm.

A highway runs northerly and southerly through said farm on the east side of the houses thereon, and the land slopes easterly from said highway. In 1876 a railroad was built across said farm in a deep cut, nearly parallel with said highway and easterly thereof. As maintained by said Daniel M. Howard the overflow water from the tub at the barn on the southerly half of said farm was carried in a blind ditch easterly, and the water ran from the end thereof in an open ditch and on depressed lands through fields in a north-easterly direction. After the death of said Daniel M. Howard said Harvey N. Howard occupied the whole of said farm as the tenant of his mother for several years, and then the division line between the north and south halves thereof was established. The building of said railroad entirely cut off the flow of said waste water from said open ditch and depressed land. As the division line was established it included in the pasture in the southeasterly corner of the north half of said farm a portion of the depressed land in which said waste water ran prior to the building of said railroad.

After the division line between said farms was established said Harvey N. Howard occupied the north half of said farm under a lease from his mother, and the defendant occupied the south half of said farm also under a lease from his mother.

On the 4th day of April, 1883, a written agreement was entered into by and between the widow of said Daniel M. Howard, said Harvey N. Howard and the defendant, by which the widow of said

Daniel M. Howard leased to Harvey N. Howard for three years from that date "that portion of the farm so set apart to and heretofore occupied by the said Harvey N. Howard and as heretofore occupied by him." And she also leased to the said Rush E. Howard for three years from that date "that portion of the said farm so set apart to and heretofore occupied by the said Rush E. Howard, and as heretofore occupied by him." They continued to occupy said farms respectively as lessees of their mother until her death in January, 1902.

About twenty-one years ago said Harvey N. Howard plowed a ditch along the westerly side of said railroad cut for the purpose of taking the waste water from said tub along said ditch into his pasture. The defendant filled up said ditch and notified said Harvey N. not to come upon his property east of the road, and nothing further has ever been done by either in regard thereto.

In the spring of 1898 the widow of said Daniel M. Howard caused to be written to the said Harvey N. Howard a letter relating to a renewal of his lease, in which letter, referring to said widow, it is stated: "She is dissatisfied with the present situation as to water supply, and insists that it be changed. The idea seems to be that the line of pump logs is the occasion of frequent repair and the digging up the ground, etc., for this purpose is in every way an inconvenience and very undesirable." In this letter a proposition was made to the said Harvey N. Howard to obtain water from another source, and the said widow offered to pay the expense thereof, and the letter continues: "Unless you are willing to give up the present source of supply you and Rush must put in iron pipes from the dam down to the fork, and you replace your branch with iron from the fork as far north in the highway as she may require. * * * She proposes to take immediate control of the water pipes for making repairs, etc., at joint expense of yourself and Rush down to the fork and several expense beyond."

Subsequently, Harvey N. Howard, by letter, replied: "I accept the other offer (offer to relay pipe with iron) providing it is laid by a competent man and in the same ditch. I will pay one-half of expense for pipe and laying of the same to the branch and all expense as far north as she may desire."

The widow and life tenant then had the logs taken out and new

iron pipes were laid by a competent man; and while a slight change was made at the intake from the creek, the pipes were laid in the old ditch. A one and one-half inch pipe was laid from the creek to the tub at the defendant's house and from that tub to the branch; a half-inch pipe was also laid from the tub to a new barn on the defendant's farm, and from the branch a half-inch pipe was laid to the defendant's old barn and a one-inch pipe to the buildings on the north farm.

From the time that Daniel M. Howard put in the water system there was what they called a "half way plug," so that the water could be shut off between the defendant's house and the creek. All of these iron pipes were laid by direction of the widow and life tenant; and under the advice of the person who laid the iron pipes a "shut-off" was put in the pipe between the creek and the tub at the defendant's house, so that the water could be shut off in case it became necessary to clean the tubs. This shut-off could only be turned with a wrench.

Harvey N. Howard sold the north farm and all claims for damages by reason of the diversion of said water to his wife, the plaintiff. The defendant paid for one-half the expense of putting in said iron pipes, and became liable to pay the remaining half thereof. Neither Harvey N. Howard nor plaintiff has ever paid any part thereof. On the 24th day of April, 1902, following the death of said widow in January, this action was commenced. The plaintiff alleges that said defendant wholly diverted said water from said pasture, and so diverted and obstructed the flow of water in the pipe to the house of the plaintiff that the same has been either wholly stopped or greatly diminished and rendered inadequate to the plaintiff's needs.

The rights of the parties must be determined by the will of Daniel M. Howard. The provisions of the will are plain. By the will Harvey N. is given the right to take water from the water pipes as they were then constructed, and the expense of keeping the main water pipe in repair is to be borne by the brothers in equal shares. The logs were replaced with iron pipe, and even if Harvey N. did not assent to the change, a renewal of the water pipes when necessary is clearly included in the provision relating to repairs. At the death of their mother the main water pipe was substantially the

same as it was at the death of Daniel M. Howard, except that it had been changed from wood to iron. The south farm then had an additional half-inch pipe from the tub in the main pipe to carry water to a new barn. The ditch carrying the waste water from the old barn as it existed at the time of Daniel M. Howard's death had been wholly destroyed by the building of the railroad. Nothing was done by the defendant between the time of his mother's death and the bringing of this action in any way affecting the water rights of the parties, and during that time no request appears to have been made by the plaintiff or by Harvey N. that any change should be made in the construction of the pipes or the amount of water used by the defendant. It is not necessary, however, to consider the technical objections to the right of the plaintiff to recover. There is nothing in the will that either directly or indirectly gives to Harvey N. the right to have the overflow water from the tub at the old barn on the defendant's premises continue to run in the ditch as it existed when his father died. Even if any such right existed under the will the changed conditions arising from the building of the railroad would require some new agreement to give the plaintiff a right to construct a ditch on another part of the defendant's lands. Under the will the owner of each farm is entitled to a reasonable use of the water upon his farm. If there is no obstruction to the water at the shut-off, it appears by the testimony introduced by the plaintiff that she has a good supply of water with the conditions as they now exist. Harvey N. testified, "I tried a number of times to find out cause of deficiency. I found out since they put in that shut-off. I went to defendant's house, and my son stayed at my place. I opened the cut-off in defendant's shed, and the water ran good at my house. Then my son came there and I went home and he did the same and the water ran good." Plaintiff's son testified : " Before we went to defendant's house the water was running scarcely at all. While at the cut-off it came very good. Then we changed places, and it came good. The supply at defendant's was abundant."

There is nothing, therefore, to show any unreasonable use of the water by the defendant. If the defendant interferes with the shut-off to the plaintiff's injury, or uses an unreasonable amount of water, the plaintiff, if she has complied with all the provisions of the will

on her part, might invoke a court of equity in her behalf, but the defendant denies that he has ever interfered with the shut-off, and the evidence before us does not show any interference with or unreasonable use of the water by the defendant

The judgment should be affirmed, with costs.

Judgment unanimously affirmed, with costs.